MARY L. HAMARSTROM, CLAIMANT, RESPONDENT, v. MISSOURI-KANSAS-TEXAS RY. CO., APPELLANT.—116 S. W. (2d) 280.

Kansas City Court of Appeals.   April 4, 1938.

*Cooper, Neel, Kemp & Sutherland* and *Frank J. Rogers* for appellant.

*Thomas W. Skidmore* and *Hume & Raymond* for respondent.

SHAIN, P. J.—In this action the question of whether or not one Frank Hamarstrom was engaged in interstate commerce at the time he received injuries, on May 10, 1934, from which he died, is the vital and controlling issue.

This cause is now before us upon rehearing. In an opinion handed down by this court at the March term, 1937, this court affirmed the judgment of the circuit court in affirming the Workmen's Compensation Commission of Missouri, awarding compensation to the respondent herein for the death of her husband, Frank L. Hamarstrom. The Workmen's Compensation Commission had made its award based upon its findings that the deceased was not at the time he received the injury from which he died engaged in interstate commerce.

The appellant herein, who was defendant below, is prosecuting this appeal under the contention that deceased at the time he received the injury was engaged in interstate commerce and that, if so, the Federal Liability Act applied and that, therefore, there was not jurisdiction of the cause of action in the Workman's Compensation Commission of Missouri.

In our former opinion, from which a rehearing was granted, this court held that interstate commerce was not involved.

In the former opinion by this court the following statements and conclusions appear in the last three paragraphs of the opinion, to-wit:

"That information of the character assembled by Hamarstrom and furnished by him to the defendant through the daily exchange sheet was information necessary to be had by the defendant in order to prosecute efficiently its business as a common carrier in transportation or that such information was required to be assembled and furnished through such report to the other carriers under orders of the Interstate Commerce Commission did not make the work of Hamarstrom in assembling such information and getting out such report work in interstate commerce or work so closely related thereto as to be a part thereof. Hamarstrom in his work never turned a car wheel or kept one from turning. The car wheels were caused to be turned or not to be turned by those whose duty it was to move the cars or trains. That was no part of Hamarstrom's duty. His duty was wholly removed therefrom. The mere fact that the work in which he was engaged, when completed and furnished to the defendant or its agents in charge of the movements of trains or cars therein, facilitated the work of such employees in such movements does not make the work of Hamarstrom work in interstate transportation or work so closely related thereto as to be a part thereof; nor would the failure of Hamarstrom to furnish the report he was required to make up and

furnish operate to make Hamarstrom's work work in interstate transportation. The retarding of the movement of the defendant's trains and the cars therein, if retarded, was the work of the defendant's other employees in charge of the movements of its trains.

"Whether the Federal Act is applicable is not to be determined from the fact that, under his general contract of employment with a railroad engaged in interstate commerce, an employee may engage in interstate commerce but is to be determined from the character of the work in which he was engaged at the very time of his injury. He must, at such time, be engaged in interstate transportation by railroad. Otherwise, the Federal Act does not apply.

"The fact that the defendant railroad was at the time of the deceased Hamarstrom's injury engaged in the general business of a common carrier in interstate transportation and that Hamarstrom was in its employ as its agent in the performance of work which he was doing is immaterial unless both the defendant railroad and Hamarstrom were engaged in interestate transportation by railroad at the very time and place of his injury. The evidence does not show that either was. The question here is whether on the case made, the Federal Act is applicable. The evidence does not show that, at the time of his injury, the deceased, Hamarstrom, was engaged in interstate transportation by railroad or in work directly connected with interstate transportation by railroad or so closely related thereto as to be practically a part thereof. The Federal Employers' Liability Act is not applicable. The Workmen's Compensation Law is therefore applicable, and the Workmen's Compensation Commission had jurisdiction. [Gilvary v. Cuyhoga Valley Ry. Co., 292 U. S. 57, 54 S. C. R. 573.]"

In its motion for rehearing the appellant urged:

"The work which Hamarstrom was doing at the time of his injury tended to facilitate and aid in the movement of cars in interstate transportation and a failure to have done the same would have hindered and delayed such transportation."

This court concluded that, in the opinion handed down at the March term, 1937, the matter presented in the paragraphs quoted above had not been given proper consideration and, therefore, a rehearing was granted.

Upon rehearing the whole case is before us for review. However, upon a re-examination of the record and consideration of all briefs filed and the hearing of the oral argument, we conclude that the statement contained in the opinion filed at our March term is a complete and correct statement. Further, we conclude that the opinion, written by Judge REYNOLDS and concurred in by the other members of the court (except as to the language of the opinion set forth in the three paragraphs above) fully meets with the approval of this court

on this rehearing. Such being our conclusion, we adopt the statement and opinion, with the exception noted, as the opinion of this court on rehearing, the same being as follows:

### STATEMENT.

This is an appeal from a judgment of the circuit court of Jackson county, affirming an award of the Workmen's Compensation Commission. On September 13, 1934, the respondent, Mary L. Hamarstrom, filed her claim for compensation with the Workmen's Compensation Commission, alleging that her husband, Frank Hamarstrom, while employed by the appellant, Missouri-Kansas-Texas Railway Company and while in the course of his employment, on May 10, 1934, received injuries from which he died on May 23, 1934. Compensation was claimed in the total amount of $642.

The employer, Missouri-Kansas-Texas Railway Company, appellant herein, filed its answer to said claim on September 26, 1934, denying liability to the claimant in any amount, under the Workmen's Compensation Act or otherwise, and alleging among other things that the employment of the deceased was in interstate transportation by railroad and that the claimant's cause of action, if any, was governed by the Federal Employers' Liability Act and the Missouri Workmen's Compensation Commission had no jurisdiction to entertain her claim.

A hearing was had before Commissioner Edgar C. Nelson on December 1, 1934, and on April 23, 1935, a total award of $5832 was made by said commissioner in favor of the claimant, which award was afterwards, upon the defendant's application for review, affirmed by the whole commission.

The necessary steps were taken to perfect an appeal to the circuit court; and, upon a hearing in Division 2 of the Circuit Court of Jackson County, the award of the commission was affirmed on January 29, 1936. From said judgment affirming such award, the defendant employer has appealed to this court.

The facts developed are substantially as follows:

The Missouri-Kansas-Texas Railway Company is an interstate carrier by railroad. Its line runs into Kansas City, Missouri, from the State of Kansas. It has only one outlet from Kansas City, Missouri, and that is through the State of Kansas. The freight offices and team tracks of the defendant railroad are located at Fourteenth and Wyoming Streets in Kansas City, Missouri. All incoming freight is unloaded at this point in Kansas City, Missouri, and all outgoing freight is loaded in Kansas City, Missouri. Its switch yards at this point are located across the Missouri-Kansas state line in Kansas, at a point known as Glen Park. Its yard office is also in the State of Kansas. Every pound of freight that is shipped to or from its freight

house crosses the Missouri-Kansas state line, and every railroad car that is moved into or out of Kansas City by the defendant crosses the Missouri-Kansas state line. The foregoing is true of all cars either delivered to or received from a connecting carrier at this point. The defendant, Missouri-Kansas-Texas Railway Company, handles no intrastate business at this point (Kansas City, Missouri). The deceased husband of the plaintiff, Frank Hamarstrom, was employed by the defendant at its freight house in Kansas City, Missouri, as night team track clerk. His hours of duty were from midnight until 9:00 A. M. with one hour off for lunch. His duties required that he report for work at the yard office of the defendant in Glen Park, Kansas, at midnight for the purpose of securing certain reports and tabulated information which had been prepared by the yard clerks during the preceding twenty-four hour period and records of incoming or outgoing trains, all mail, telegrams, and other office communications for the local freight office of the defendant at Fourteenth and Wyoming Streets in Kansas City, Missouri, and take them there for use by him at such latter office in making up a daily interchange report required to be made by the defendant under the rules of the Interstate Commerce Commission. He also acted as night watchman at the freight house. He patrolled the team tracks during the night and inspected the cars on the tracks and made a record of the seals thereon. He saw to the icing of the refrigerator cars in the summer time and to the heating of the same in the winter time.

The daily interchange report which he was required to prepare was a report of all cars delivered by the defendant to connecting carriers during the twenty-four hour period ending at midnight when he entered upon his duty. When an incoming train arrived at the employer's yards at Glen Park, Kansas, it ordinarily contained cars destined for points on other railroad lines beyond Kansas City. On the arrival of the train, cars therein to be delivered to other lines were switched and classified into groups by railroads—that is to say, cars that went to some point on the Alton Railroad were placed in one group and cars that went to some point or points on the Wabash were placed in another group and so on until the entire train was classified. A report for each group of cars was made out by the yard clerks. This report showed the number and initials of each car, its contents, its destination, the railroad that it was to be delivered to, the time of its departure from the defendant's yards, and the time it was accepted by the receiving carrier at its yards. This report was known as a "501 report," and the rules of the carriers required that this report accompany the cars that were delivered to connecting lines, and they would not be received by such connecting lines unless such report was furnished. The same rule and practice applied to cars that were delivered to the defendant by connecting lines. Whenever a group of cars was received from a connecting carrier

destined to points upon the defendant's line, the 501 report accompanied such delivery of cars.

On the day in question, May 10, 1934, Hamarstrom reported at the yard office of the defendant at approximately 11:45 P. M. He secured the 501 reports that had accumulated for the twenty-four hour period preceding, also a wheel report of one of the defendant's trains (No. 273) which had left its yard en route to Parsons, Kansas, at 7:25 P. M., also a telegram relating to the diversion of a car of oranges shipped from Los Angeles, California, which was on the defendant's track at its freight office. He then started on his way with such reports and telegram to the freight office in Missouri and, while waiting for a street car on Southwest Boulevard, was struck and injured by a passing automobile, which was driven by a third party having no connection with the railroad employer. He was given emergency treatment and taken to St. Mary's Hospital in Kansas City, Missouri. He afterward died as a result of his injuries. The clerk in charge of the employer's yard office learned of Hamarstrom's injury shortly after the accident and sent an employee to the hospital to secure the records which Hamarstrom was carrying. Such records were obtained by the employer and taken to the freight office, where they were used in preparing the daily interchange report; and part of these records (the 501 reports) was later sent to the interchange bureau to be checked against 501 reports of other carriers.

It was Hamarstrom's duty to prepare from such reports and other papers in his possession taken from the Glen Park station the daily interchange report, work on which he was required to begin as soon as he arrived at the office at Fourteenth and Wyoming Streets in Kansas City, Missouri; and he was on his way with such reports to perform such duties at the time he was injured. The interchange report contained a record of all cars delivered by the defendant railroad to connecting carriers for the twenty-four hour period ending at midnight, the destination of cars, their contents, and seal numbers of the cars, the railroad to which each car belonged, the time of delivery to a connecting carrier, and the place of delivery. This report when prepared was to be delivered to F. W. Trapnel, chief interchange inspector for the Kansas City Terminal Railway Company, through whose office an interchange checking bureau was maintained. All other railroads at this point made similar reports and delivered the same to the interchange bureau. The 501 reports were also required to be delivered to be checked against the forwarding line's copy to determine the correctness of each, and each was then required to be checked back against the interchange report. These copies were required to be checked one against the other at the interchange bureau and verified and any mistakes therein were corrected. After verification, one was filed with the interchange bureau, one was delivered to the receiving carrier, and one was filed in the local office of the carrier

in Kansas City, and one was mailed to the car accountant of each carrier. The information contained in the interchange report was a record of the movement between railroads and was used as a basis for determining the amount to be paid to other lines for car rental and the amount to be received from other lines for rental of the defendant's equipment. The information contained in the interchange report also enabled the carrier to locate its cars and to locate foreign cars upon its line and to determine the places of delivery of such cars—that is, the points to which the foreign cars were to be returned. It contained billing references and information on all of the cars which had to be recorded and a record made thereof. A foreign car (that is, a car belonging to some other railroad) when received had two destinations. The first was the destination of the lading; the second was the home of the car, which was the point from which it was received and to which it had to be returned. It was the duty of the receiving carrier to return foreign equipment to the place where received without any delay. The information in the interchange report was utilized in the return of foreign cars to the proper points. The rules of the Interstate Commerce Commission required that such report be preserved for a period of three years and that it be subject to inspection by members of the Interstate Commerce Commission. All of the information contained in the interchange report related to cars moving in interstate traffic. As heretofore stated, Hamarstrom was en route from the yard office to the freight office with information that he would use in preparing the above report upon his arrival at the freight office and was carrying the 501 reports which contained such information and which reports would be delivered to the interchange bureau, together with the interchange report to be used in verifying such report, when he was struck and injured. As a result of his injuries, Hamarstrom died on May 23, 1934; and his wife, Mary L. Hamarstrom, on September 13, 1934, filed her claim with the Workmen's Compensation Commission of Missouri.

## Opinion.

1. The sole question raised on this appeal relates to the jurisdiction of the Workmen's Compensation Commission to entertain the plaintiff's claim for compensation and make an award thereon; and such question depends on whether or not the work in which the plaintiff's deceased husband, Frank Hamarstrom, was engaged at the time of his injury was work being done in interstate commerce or work so closely related to interstate commerce as to be practically a part thereof within the meaning of the Federal Employers' Liability Act, so as to bring him at such time under the provisions of such act. If so, the plaintiff's rights are to be determined under said act alone; and the Workmen's Compensation Commission is without jurisdiction. If, however, the work in which the deceased, Hamarstrom, was engaged

at the time cannot be characterized as work in interstate commerce within the meaning of the Federal Act, the Workmen's Compensation Commission has jurisdiction; and the plaintiff's rights are fixed by and are to be determined under the Missouri Workmen's Compensation Act.

The test as to whether the Federal Employers' Liability Act is applicable to and covers work in which an employee is engaged at the time of his injury depends on whether or not at such time such employee was engaged in interstate transportation or work so closely related to it as to become practically a part thereof. [Allen v. St. Louis-San Francisco R. Co., 331 Mo. 461, 53 S. W. (2d) 884.]

In the Allen case, above cited, it is said, l. c. 889 of S. W. (2d):

"Considering the provisions of the Federal Employers' Liability Act whereby a common carrier by railroad 'while engaging in commerce between any of the several States' is made liable in damages for injury suffered by any person through the negligence of the railroad company 'while he is employed by such carrier in such commerce,' as construed and interpreted by the Supreme Court of the United States in the cases which we have reviewed, no right of recovery arises thereunder, unless the employee was 'at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it.' Citing the Shanks Case and Chicago & E. I. R. Co. v. Industrial Comm., *supra,* it is said in New York, New Haven & Hartford R. R. Co. v. Bezue, 284 U. S. 415, 52 S. Ct. 205, 207, 76 L. Ed. 370, decided January 25, 1932: 'The criterion of applicability of the statute is the employee's occupation at the time of his injury in interstate transportation or work so closely related thereto as to be practically a part of it.''

2. The question in this case, therefore, to be determined is whether or not the plaintiff's deceased husband was at the time of his injury engaged in interstate transportation by railroad within the meaning of the Federal Act or in work so closely related to interstate transportation as to be practically a part of it.

The defendant contends that he was. It insists (1) that Hamarstrom's act in transporting mail, reports affording information as to cars moving in interstate commerce, wheel reports of train movements in interstate traffic, and office communications from the defendant's yard office in Kansas to its local freight house in Missouri was an act of interstate commerce; (3) that the work in which Hamarstrom was engaged was work directly connected with interstate transportation and so closely related thereto as to be practically a part thereof; (3) that the work which Hamarstrom was doing at the time of his injury tended to facilitate and aid in the movement of cars in interstate transportation and that a failure to have done such work would have hindered and delayed transportation.

The record shows that, at the time of his injury, the deceased,

Hamarstrom, had reported for duty at the yard office of the defendant in Kansas for the purpose of securing mail, reports, and communications to be taken by him to the local freight office of the defendant at Fourteenth and Wyoming Streets in Kansas City, Missouri, where he was required at such latter office to make up therefrom a daily interchange report, and that he had picked up all such matters affording information to make up such report and had them on his person and was on his way with them from the defendant's station in Kansas to its freight office in Missouri at the time that he was injured. All reports carried by him related to cars moving in interstate commerce and work necessary for use in compiling the interchange report.

3. It is insisted by the defendant that the transportation of such mail and records across the state line was an act of interstate commerce relating directly to interstate transportation and that the deceased, Hamarstrom, being in its service at such time and transporting such mail and records for it as its agent, must be held to have been engaged in interstate transportation under the Federal Employers' Liability Act. In support of its contention, it cites Zenz v. Industrial Accident Association, L. R. A. 1918D, 423, 168 Pac. 364; Lynch v. Boston & Maine Railroad, 227 Mass. 123; Champion v. Ames, 188 U. S. 321. The authorities cited support the defendant's contention to the extent that transportation by railroad of records containing information over a state line is interstate commerce.

While it appears that Hamarstrom was engaged in transportation at the time of his injury, it does not appear that he was at such time engaged in interstate transportation by railroad, so as to make the Federal Employers' Liability Act applicable for a determination of the plaintiff's rights. To have been so engaged as to make such act applicable he must have been engaged in interstate transportation by railroad at the very time thereof. [Allen v. St. Louis-San Francisco R. Co., *supra*.] He was not so engaged. He was standing in the street awaiting a street car upon which he intended to ride across the state line, which car did not belong to the defendant's system of railroad and formed no part thereof.

The Federal Employers' Liability Act declares: "Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, etc." If the injury results in whole or in part from the negligence of its carrier, officers, agents, or employees.

It has been held that the expression "by railroad" in the federal statute is but descriptive of the kind of common carrier to which the statute relates, distinguishing railroads from common carriers of other kinds to which the act does not extend, and that, by the statute,

it was not attempted or intended to define the kind of instrumentalities used on which their liability for negligence should exist or by which it should be limited; that it might employ as part of its system of transportation other instrumentalities than its own trains, such as floats, tugboats, and the like; and that an employee engaged in interstate commerce injured while upon one of such instrumentalities being so utilized comes within the act. [Second Employers' Liability Cases, 223 U. S. 1-32.]

However, that is not this case. The record does not show how far the Glen Park station of the defendant in Kansas is from its freight office at Fourteenth and Wyoming Streets in Missouri or that any means of transportation was provided by the defendant for use by the deceased in going from the one to the other or any fixed route established. The record shows that, at times, Hamarstrom, of his own volition, used a street car and that, at the time of his injury, he was standing in the street waiting for a street car to come along on which he might ride across the state line. The street car was not the property of the defendant or any part of its transportation system.

It is evident that, at the time of his injury, the deceased, Hamarstrom, however he might otherwise have been engaged, unless he was to be considered as a mere instrumentality used by the defendant railroad as a part of its transportation system, was not engaged in transportation by railroad. That he could be so considered a mere instrumentality in use as a part of the defendant's transportation system does not appear to be within the contemplation of the Federal Act. The Federal Act did not, under the evidence, become applicable.

4. The defendant insists that the work in which the deceased, Hamarstrom, was engaged at the time of his injury was so closely related to interstate commerce as to be practically a part thereof and that therefore the Federal Act became applicable.

The work in which Hamarstrom was engaged under his contract with the defendant was merely the assembling of information with reference to its own and foreign cars which had been delivered to or received from other roads, the number of the cars for identification purposes, the places where delivered or received, their destinations, and the points to which they were to be returned. He did not have anything to do with the moving of any such cars from one point to another. His work was merely for the convenience of those whose duty it was to cause such cars to be moved or transported and returned to the points at which they were delivered or received. He was not engaged in the transportation of any of said cars. He never moved or caused a car to be moved. Such was not within the scope of his employment. The work in which he was engaged was too remote to have become any part of transportation.

The mail and other matters which the employee was carrying at the time of the injury were introduced in evidence and identified as the

defendant's Exhibits 1, 2, 3, 4, and 5. Exhibit 1 was a written statement of twelve pages known as "form 501" report upon which was recorded a description of the cars delivered by the defendant to other railroads in Kansas City, Missouri, from its Glen Park yard on May 10. Exhibit 2 was a record of the cars received by the defendant into its Glen Park yard from other railroads on May 10. Exhibit 3 was a duplicate copy of a wheel report covering the movement of one of the defendant's freight trains which left the defendant's yard en route to Parsons, Kansas, 7:25 P. M., May 10. Exhibit 5 was a telegram directing that a car of oranges be diverted to Chicago, Illinois. The defendant's said freight office was advised of the contents of the telegram at 9:27 P. M., May 10. The defendant's general agent, Hosmer, said that the defendant's Exhibit 4 was a duplicate copy "of interchange report covering deliveries to other railroads from our Glen Park yards for the period eleven-fifty-nine P. M., May 9th to eleven-fifty-nine, May 10th."

It was shown that the first duty of the employee, had he arrived at the defendant's freight office in Kansas City, Missouri, would have been to prepare an interchange report (the same in form as Exhibit 4), from the information contained in the 501 reports. The time required in preparing such a report was three to three and one-half hours. The original and copies of the interchange report were sent to the chief interchange inspector for the Kansas City Terminal Railway Company "whose office acts as an interchange checking bureau."

The witness Hosmer further testified as follows:

"Q. What is the purpose of this interchange report, Mr. Hosmer, why is it prepared? A. Well, it is mainly for the purpose of keeping a record of the movement between railroads of cars in order that the per diem payments can be accurately checked against the interchange report to determine their correctness.

"Q. Does it serve any other purpose? A. It would serve the same purpose on cars owned by our railroad delivered to other railroads as it would on cars on hand with our railroad that belonged to our railroad.

"Q. And what do you do with this, how many copies of this report do you make? A. I believe right at this time there is an original and three copies being made.

"Q. What do you do with those? A. The original is sent to the car Accountants office, Parsons, one copy is kept by the Interchange Bureau, one copy to the connecting line interested and one copy for our record at the office.

"Q. Are you required to make this report by any rule of the Interstate Commerce Commission? A. That is an I. C. C. classified report we are required to make it and keep it on file for a period of three years.

"Q. Do you know whether it is a uniform report all over the nation or not? A. It is.

"Q. Every railroad makes a similar report? A. Yes, sir. . . .

"Q. In all these exhibits, one, two, three and four and five, I will ask you if there is anything in those exhibits that would in any way retard a movement of an interstate shipment? A. Retard the actual movement?

"Q. Yes, sir. A. The actual movement from yard to yard, no, from town to town, yes. There is billing reference and information on all of them that has to be recorded and a record made of.

"Q. That is, those are made up you mean following the shipment. A. Yes, sir, I don't mean—I think I misunderstood you. You mean to follow after this shipment is gone.

"Q. Yes, sir. A. No, that isn't it, Mr. Skidmore, it is to see that the shipment is moving properly. In other words, the shipment cannot move improperly and those records have to be made in order to determine that they have been moved properly."

The evidence shows that every car coming into or going out of the defendant's yards during the twenty-four-hour period ending at midnight, May 10, was moved in interstate commerce and that the mail carried by the employee at the time of injury was a record of those movements. The employee at the time of the injury was on his way from the defendant's yard in Kansas to the defendant's freight office in Missouri, carrying the railroad mail of his employer, which was a record of past events and had no direct connection with transportation in interstate commerce within the meaning of the Federal Act. [Chicago & Northwestern Railway Co. v. Bolle, 52 S. C. R. 59, 284 U. S. 74; Chicago, Burlington & Quincy R. Co. v. Harrington, 241 U. S. 177; Shanks v. Delaware Lackawanna & Western Railroad Co., 36 S. C. R. 188, 239 U. S. 556; Trout v. Chicago, R. I. & P. R. Co. (Mo. App.), 39 S. W. (2d) 424.]

In the case of Milburn v. Chicago, M., St. P. & P. R. Co., 331 Mo. 1171, 56 S. W. (2d) 80, the court held that an employee, while loosening rock in a quarry to be used for ballasting a track was not engaged in interstate commerce. "Nor is an employee, while unloading ties to be stored along the right of way for future use. . . . Nor an employee unloading poles to be later used for repair of an interstate telegraph line. . . . Nor an employee disconnecting old rails which had been removed when a track was repaired and left on the right of way. . . . Nor an employee mining coal for use in interstate engines. . . . Nor an employee taking coal to bins or chutes where it would be used by engines in interstate traffic."

Carrying the mail across the state line was a mere incident to the employee's daily task. [Trout v. Chicago, R. I., & P. R. Co., *supra*.] Besides, Hamarstrom was not, while carrying the mail, moving by railroad. And the trip which he was making was not in "direct furtherance of interstate traffic or work so closely connected with interstate traffic as necessarily to become a part thereof." [Manes v. St. Louis-San Francisco R. Co., 205 Mo. App. 300, 220 S. W. 14.]

The defendant cites in its brief under this head numerous authorities in support of its contention, wherein it was held that, under the facts in consideration in each, the employee was engaged in interstate transportation or work so closely related thereto as to form a part thereof.

Whether or not the work in which an employee is engaged is work in interstate commerce or is so closely related thereto as to be a part thereof is not to be determined by any fixed rule. Every case depends on the particular facts involved therein.

In none of the cases cited by the defendant were the facts under consideration the same as here. Such cases, therefore, are not controlling here.

The appellant urges, and with reason, that under the present Employers' Liability Act the legislative intent was to include within its protection all railroad employees whom Congress could include.

In N. Y. C. R. Co. v. Winfield, 244 U. S. 147, 1. c. 149, it is said:

"And the reports of the congressional committees having the bill in charge disclose, without any uncertainty, that it was intended to be very comprehensive, to withdraw all injuries to railroad employees in interstate commerce from the operation of the varying state laws, and to apply to them a national law having a uniform operation throughout all the states."

Many authorities are cited to same effect. We conclude that the above language is sufficient without comment on other authorities cited.

Conceding that the law is as set forth above, the question remains as to whether or not the employee at the time of injury was engaged in interstate commerce. This question must be determined by the nature of the work the employee was engaged in at the time of his injury. [Sailor v. Mo. Pac. Railroad Co., 322 Mo. 396, 18 S. W. (2d) 32.]

In order to come within the provisions of the Employers' Liability Act the employee at the time of his injury must be engaged in service that is a part of interstate commerce. [Trowbridge v. Kansas City & Westport Belt Ry. Co., 192 Mo. App. 52.]

The appellant cites and quotes from Roberts on Federal Liability of Carriers, Vol. 2, Second Edition, page 1370. The author in the text classifies employees in two groups as follows:

"It is thus apparent that employees who come under the act include primarily those whose service immediately contemplates, or directly results in, the actual movement of interstate traffic; and secondarily another group who come under the act because the relation of their service to the instrumentalities, by the operation of which interstate traffic moved, is so close that, practically speaking, such service is inseparable from the actual use of those instrumentalities in moving traffic interstate."

The author sets forth the test as follows:

"(1) Was the employee participating in the actual movement of traffic? (2) Was such traffic interstate in character? If his service meets both of these tests he is under the act and the inquiry is at an end."

We conclude that the above principles, as quoted, are sound and accept same in review of the point now under consideration.

If the deceased employee in the case at bar can be said to come within the provisions of the act, it must be under the classification of what is termed as the second group.

When we conclude, as we do, that the legislative intent was to include all employees that come within the constitutional powers to include, and take into consideration that the employee herein, if included, must come under the second group, it follows that the question as to whether or not said employee comes within the act presents a twilight zone wherein there becomes involved an issue of fact that must be determined by consideration of the evidence and with consideration of the law.

We conclude that the question of whether or not the employment engaged in by the employee at the time of his injury came within the scope of the act depends on whether or not the papers and documents which he had in his possession and which he was transporting from the yards in Kansas to the office in Missouri were necessary to the movement of cars while engaged in interstate commerce.

This question arises, to-wit: If the papers and documents being transported by the deceased had been entirely destroyed at the time of his injury, would this have affected the transportation of the cars, to which the papers and documents in his possession referred, in interstate transportation while said cars were so engaged?

In determining the above question, it must be determined as to when the cars involved ceased to be in interstate commerce.

We conclude that any movement of the cars in question after the interstate movements terminated cannot be considered as having any application to the issue presented in the case at bar. In other words, any papers or documents in the possession of the deceased employee that would facilitate the movements of cars after said cars had ceased to be in interstate commerce cannot be considered on the question as to whether he was engaged in interstate commerce at the time of his injury.

It appears to be well established by courts of Missouri and of the United States that where a car has reached its destination and had been delivered in accordance with the consignment, its interstate *status* is terminated. [Aldridge v. Wabash Ry. Co., 73 S. W. (2d) 401; Chicago, B. & Q. R. Co. v. Harrington, 241 U. S. 177; Leigh Valley Ry. Co. v. Barlow, 244 U. S. 183; Baltimore & C. S. W. Ry. Co. v. Settle, 260 U. S. 166.]

The purport of letters and documents that were being transported by the employee at the time he was injured are fully set forth above.

Appellant contends that what the employee was doing at the time he was injured was in aid of movements of cars in interstate commerce and that a failure of the act of the employee would have hindered and delayed such transportation. From our examination of these papers and documents that were being carried by the employee, we conclude that these papers and documents were, as to the cars involved, the record of past events insofar as their movements to their destination was involved, and we find nothing therein from which we can conclude that the cars referred to would be hindered and delayed before reaching their destination and being delivered and their movements interstate terminated.

There were matters contained in the letters and documents that would facilitate the movement of these cars after the interstate movement had terminated. This, we conclude, has no bearing upon the question of whether or not the duties employee was performing at the time of his injury was in aid of movement of the cars while in interstate commerce.

The mere fact that appellant makes the statement that what the employee was doing was in aid of such movement and that delay and hindrance in said movement would occur cannot be considered by us in the absence of some evidence from which such a conclusion can be reasonably drawn. We have read the record in this case and find no evidence from which, we conclude, such inference can be reasonably drawn. We have examined the briefs filed and appellant has cited no evidence from which such conclusion can be drawn. In the absence of such evidence we feel impelled to sustain the conclusion reached by the Workmen's Compensation Commission, to the effect that the employee was not engaged in interstate commerce at the time he received his injury.

The judgment of the circuit court affirming the award of the Workmen's Compensation Commission is affirmed. All concur.